George M. Kraw (California Bar No. 71551)
Michael Korda (California Bar No. 88572)
Katherine McDonough (California Bar No. 241426)
Kraw Law Group, APC
605 Ellis Street, Suite 200
Mountain View, California 94043
Telephone: (650) 314-7800
Facsimile: (650) 314-7899
gkraw@kraw.com
mkorda@kraw.com
kmcdonough@kraw.com

Valentina Mindirgasova (California Bar No. 272746)
Kraw Law Group, APC
1017 East Grand Avenue
Escondido, CA 92025
Telephone: (760) 747-1100
vmindirgasova@kraw.com

Attorneys for: Plaintiffs, GCIU-Employer Retirement Fund, and
Board of Trustees of the GCIU-Employer Retirement Fund

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GCIU-EMPLOYER RETIREMENT FUND, | CASE NO. |
| And, | **COMPLAINT TO ENFORCE ARBITRATION AWARD, IN PART, AND TO VACATE OR MODIFY ARBITRATION AWARD, IN PART, FOR ERISA WITHDRAWAL LIABILITY** |
| BOARD OF TRUSTEES OF THE GCIU-EMPLOYER RETIREMENT FUND, | |
| PLAINTIFFS, | |
| v. | |
| WESTROCK COMPANY (Successor of MeadWestvaco Corporation), a Delaware Corporation, | |
| And, | |

COMPLAINT - 1

WRKCO INC. (Successor of MeadWestvaco Corporation), a Delaware Corporation,

And,

WESTROCK MWV, LLC, formerly known as MeadWestvaco Corporation, A Delaware Limited Liability Company,

DEFENDANTS.

Plaintiffs, GCIU-Employer Retirement Fund and the Board of Trustees of the GCIU-Employer Retirement Fund (collectively the "Plan") bring this action against Defendants WestRock Company, WRKCo Inc., and WESTROCK MWV, LLC, successors of MeadWestvaco Corporation ("MeadWestvaco" and/or "MWV") pursuant to the provisions of Title IV of the Employee Retirement Income Securities Act ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") 29 U.S.C. §1381 et seq.

## JURISDICTION

1.     This Court has jurisdiction over this action pursuant to 29 U.S.C. §§ 1401(b)(2) and 1451(c).

## VENUE

2.     Venue is appropriate in this judicial district pursuant to 29 U.S.C. 1451(d), in that the GCIU-Employer Retirement Fund is administered in Pasadena, California.

## THE PARTIES

3.     Plaintiff GCIU-Employer Retirement Fund is a multiemployer pension plan within the meaning of 29 U.S.C. §§ 1002(37) and 1301(a)(3).

COMPLAINT - 2

4.      Plaintiff Board of Trustees of the GCIU-Employer Retirement Fund is comprised of the present trustees who are the named fiduciaries of the Fund within the meaning of 29 U.S.C. § 1102(a), and is the plan sponsor of the Plaintiff Fund within the meaning of 29 U.S.C. §§ 1002(16)(B)(iii) and 1301(a)(10).

5.      MeadWestvaco Corporation was a Delaware Corporation. At all times relevant to this action, MeadWestvaco and its controlled group had been an "employer" as the term is defined by section 3(5) of ERISA, 29 U.S.C. § 1002(5), and was engaged in an industry affecting commerce, as defined by section 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a).

6.      During all relevant times, MeadWestvaco was signatory to a number of collective bargaining agreements under which they were required to make contributions on behalf of its covered employees to the Plan.

7.      On April 17, 2015, MeadWestvaco entered into a second amended and restated business combination agreement with Rock-Tenn Company, a Georgia Corporation ("2015 Merger Agreement").  As part of 2015 Merger Agreement, a new entity, WestRock Company, was formed.  MeadWestvaco Corporation became a wholly owned subsidiary of WestRock Company.  The agreement also provided that MeadWestvaco Corporation would be converted to a Delaware Limited Liability Company soon thereafter. MeadWestvaco Corporation was thereafter converted to Westrock MWV, LLC, a Delaware Limited Liability Company. Also, as part of the 2015 Merger Agreement, each share of MeadWestvaco Corporation common stock, par value of $0.01 per share, was converted into the right to receive 0.78 shares of common stock, par value $0.01 per share, of WestRock Company stock. Each share of common stock, par value $0.01, of RockTenn was converted into the right to receive, at the election of the shareholder (subject to some proration): (i) one share of WestRock Company Common Stock or (ii) an amount in cash.  The 2015 Merger Agreement was a change in corporate structure described in 29 U.S.C. § 1369(b), as such Westrock

Company is an original employer under 29 U.S.C. § for purposes of MeadWestvaco Corporation's withdrawal liability, and a successor in interest for purposes of MeadWestvaco Corporation's withdrawal liability. Likewise the subsequent conversion of MeadWestvaco Corporation into a Delaware Limited Liability Company, was a change in corporate structure described in 29 U.S.C. § 1369(b) and Westrock MWV, LLC is an original employer under 29 U.S.C. § 1398 for purposes of MeadWestvaco Corporation's withdrawal liability and a successor in interest to MeadWestvaco Corporation for purposes of withdrawal liability. Thus, WestRock Company and Westrock MWV, LLC are original employers for purposes of MeadWestvaco's withdrawal liability under 29 U.S.C. § 1398 and successors in interest to MeadWestvaco, and within the same controlled group of corporations and are therefore jointly and severally liable for MeadWestvaco's withdrawal liability.

8.     On November 2, 2018 (hereinafter "2018 Merger") pursuant to the Agreement and Plan of Merger dated as of January 28, 2018, among WRKCo Inc. (formerly known as "WestRock Company"), KapStone Paper and Packaging Corporation ("KapStone"), WestRock Company (formerly known as Whiskey Holdco, Inc.) (the "Company" or "WestRock"), Whiskey Merger Sub, Inc. and Kola Merger Sub, Inc., the Company acquired all of the outstanding shares of KapStone through a transaction in which: (i) Whiskey Merger Sub, Inc. merged with and into WRKCo, with WRKCo surviving such merger as a wholly owned subsidiary of the Company (the "WestRock Merger" ), and (ii) Kola Merger Sub, Inc. merged with and into KapStone, with KapStone surviving such merger as a wholly owned subsidiary of the Company (the "KapStone Merger" and, together with the "WestRock Merger," the "Mergers" ). As a result of the Mergers, among other things, the Company became the ultimate parent of WRKCo, KapStone, and their respective subsidiaries. Effective as of the effective time of the Mergers, the

Company changed its name to WestRock Company and WRKCo changed its name to WRKCo Inc.

9. The 2018 Merger was a change in corporate structure as defined by 29 U.S.C.§ 1369(b), thus WestRock Company and WRKCo, Inc. are original employers for purposes of MeadWestvaco's withdrawal liability under 29 U.S.C. § 1398, and successors in interest to MeadWestvaco, and within the same controlled group of corporations and are therefore jointly and severally liable for MeadWestvaco's withdrawal liability.

10. Thus, Defendants WestRock Company, WRKCO, Inc., and Westrock MWV, LLC, are original employers for purposes of MeadWestvaco's withdrawal liability under 29 U.S.C. § 1398 and successors in interest to MeadWestvaco, and within the same controlled group of corporations and are therefore jointly and severally liable for MeadWestvaco's withdrawal liability.

## THE FACTS

**The Withdrawal Liability Assessments**

11. MeadWestvaco controlled group included two Employers that contributed to the Plan between 2005 and 2014: MeadWestvaco Calmar, Inc. and MeadWestvaco – US Envelope Division.

12. In 2011, MeadWestvaco sold U.S. Envelope Division to Cenveo Corporation, thereby triggering a partial withdrawal from the Plan under ERISA Section 4205(a)(2) in the 2011 Plan year (the "2011 Partial Withdrawal"). 29 U.S.C. § 1385(a)(2).

13. On November 1, 2013, the Plan issued to MeadWestvaco a notice of partial withdrawal liability and a demand for payment $18,367,675 for the 2011 Partial Withdrawal (the "2011 Assessment" in accordance with 29 U.S.C. §§ 1382(2) and 1399(b)(1)).

14. In December 2013, MeadWestvaco began making installment payments to the Plan for the 2011 Partial Withdrawal.

15.     MeadWestvaco sent the Plan a check dated December 19, 2013 in the amount of $2,249,244.24, which represented 24 monthly installment payments of $93,718.51 for each month between January 2012 and December 2013 for the 2011 Partial Withdrawal.

16.     In January 2014, MeadWestvaco completely withdrew from the Plan (the "2014 Complete Withdrawal").

17.     On or about January 21, 2015, Milliman, the Plan's actuary, prepared an estimated assessment for MeadWestvaco for settlement negotiation purposes that included the 2011 Partial Withdrawal, a complete withdrawal from the Fund in the 2013 Plan Year, and partial withdrawals in the 2012, 2013, and 2014 Plan Years.

18.     The January 21, 2015 Milliman estimate showed that because of offsetting credits for other withdrawals, the total withdrawal liability for the 2011 Partial Withdrawal was $864,861.

19.     MeadWestvaco made monthly payments of $93,718.51 towards the 2011 Partial Withdrawal liability according to the Plans November 2013 payment schedule through June 2014.

20.     In June 2014, the Plan and MeadWestvaco agreed to suspend payments of the 2011 Partial Withdrawal, beginning with the July 2014 installment.

21.     MeadWestvaco and the Plan agreed to suspend payments of the 2011 Partial Withdrawal due to negotiations between the parties to transfer Plan assets and liabilities associated with MeadWestvaco's participation in the Plan to another retirement benefit plan.

22.     The parties never effected a transfer of the assets and liabilities associated with MeadWestvaco's participation in the Plan to another retirement benefit plan.

23.   MeadWestvaco resumed payments towards the 2011 Partial Withdrawal Liability under the Plan's schedule in July 2015.

24.   As a result of MeadWestvaco's 2014 Complete Withdrawal, the Plan's actuary was tasked with reviewing its contribution history and assessing it with withdrawal liability.

25.   The Plan's actuary determined that MeadWestvaco also experienced five partial withdrawals from the Plan for each plan year where there was a 70-percent decline in contributions based on a three-year testing period ending with the last day of the relevant plan year. *See* 29 U.S.C. § 1385(a)(1); 29 U.S.C. § 1385(b).

26.   The Plan's actuary, prepared MeadWestvaco's complete and partial withdrawal liability assessments in accordance with ERISA and the Plan's Withdrawal Liability Procedures.

27.   The MeadWestvaco withdrawal liability assessments were calculated by the Plan's actuary pursuant to 29 U.S.C.§1393 and used the Pension Benefit Guaranty Corporation's published interest rate ("PBGC rate") used to value annuities under a mass withdrawal to calculate the unfunded vested benefits of the Plan for the various years that encompassed each of MeadWestvaco's assessments.

28.   In accordance with 29 U.S.C. §§ 1382 and 1399, on March 12, 2018, the Plan issued notices and demands to MeadWestvaco for payment for five partial withdrawals and one complete withdrawal; specifically:

a.   Revised assessment of the 2011 Partial Withdrawal under ERISA Section 4205(a)(2), 29 U.S.C. § 1385(a)(2);

b.   Assessment of a 2012 Partial Withdrawal under ERISA Section 4205(a)(1), 29 U.S.C. § 1385(a)(1);

c.   Assessment of a 2013 Partial Withdrawal under ERISA Section 4205(a)(1), 29 U.S.C. § 1385(a)(1);

d.   Assessment of a 2014 Complete Withdrawal under ERISA Section 4203(a), 29 U.S.C. § 1383(a);

e.   Assessment of a 2014 Partial Withdrawal under ERISA Section 4205(a)(1) 29 U.S.C. § 1385(a)(1);

f.   Assessment of a 2015 Partial Withdrawal under ERISA Section 4205(a)(1), 29 U.S.C. § 1385(a)(1).

29.   In its revised assessment of the 2011 Partial Withdrawal, the Plan recalculated the 2011 Partial Withdrawal as totaling $850,765.

30.   Between December 19, 2013 and March 12, 2018, MeadWestvaco or its successors remitted to the Plan 76 monthly payments of $93,718.51, totaling $7,122,606.74, for the original 2011 Partial Withdrawal assessment.

31.   The difference between the amount MeadWestvaco paid to the Plan with respect to the 2011 Partial Withdrawal as of March 12, 2018, and the amount the Plan claims is due and owing as of March 12, 2018, was $6,271,841.74.

**The Arbitration Proceedings**

32.   Westrock Company and a group of trades and businesses under common control including MeadWestvaco Corporation submitted the dispute regarding the Plan's withdrawal liability assessments and the methodologies used to calculate those liabilities to arbitration pursuant to 29 U.S.C §1401(a)(1).

33.   The arbitration proceedings were conducted in accordance with the Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes ("Rules") of the American Arbitration Association ("AAA").

34.   Westrock Company and a group of trades and businesses under common control including MeadWestvaco Corporation challenged the Plan's assessments for 2014 and 2015 partial withdrawals pursuant to 29 U.S.C. §1385(a)(1), alleging that such partial withdrawals could not occur because MeadWestvaco completely withdrew from the Plan pursuant to 29 U.S.C. §1383

as of the 2014 Plan year, and because such assessment was inconsistent with 29 U.S.C. § 1386 (hereinafter referred to as "**Issue No. 1**").

35.     Westrock Company and a group of trades and businesses under common control including the MeadWestvaco Corporation also challenged the interest rate utilized in the withdrawal liability assessments by the Plan's actuary to calculate the Plan's unfunded vested liabilities for withdrawal liability assessment purposes alleging that the interest rate used violated 29 U.S.C. § 1393 (hereinafter referred to as "**Issue No. 2**").

36.     Westrock Company and a group of trades and businesses under common control including MeadWestvaco alleged that the Plan was required to pay or credit interest on its overpayment of the 2011 Partial Withdrawal assessment which resulted from the Plan's assessment of the 2012 Partial Withdrawal assessment which resulted in the consequent recalculation of the 2011 Partial Withdrawal assessment) (hereinafter referred to as "**Issue No. 3**").

37.     The Plan disagreed with MeadWestvaco's challenges.

38.     MeadWestvaco submitted a Motion in Limine to exclude the Plan's expert's report and testimony of the Plan's actuary on Issue No. 1, which the Arbitrator granted. Thus, the Plan's expert's report was excluded, and the Plan's expert could not testify about the statutory propriety of assessing partial withdrawals for the year of MeadWestvaco's complete withdrawal or the following year.

**The Issuance of the Final Award**

39.      Issues Nos. 1-3 were submitted to the Arbitrator on joint facts, joint exhibits, and briefs in lieu of a hearing.

40.     Arbitrator Norman Brand's Final Award was issued by the AAA on September 28, 2021, addressing all issues submitted for arbitration.  A true and correct copy of the Final Award is attached hereto.

41.     On Issue No. 1, the Arbitrator ruled in favor of MeadWestvaco.

42.     On Issue No. 2, the Arbitrator ruled in favor of the Plan.

43.     On Issue No. 3, the Arbitrator ruled in favor of the Plan.

44.     The MPPAA provides that "[u]pon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action no later than 30 days after the issuance of an arbitrator's award, in an appropriate United States district court in accordance with section 1451 of this title to enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2).

45.     This complaint is timely pursuant to 29 U.S.C. § 1401(b)(2) as it was commenced upon completion of the arbitration proceedings and within 30 days of the issuance of the award that the Plan hereby petitions this Court to enforce in part and vacate or modify in part.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plan prays for the following relief and judgment against the Defendants as follows:

(a) The Final Award should be vacated or modified as to the Arbitrator's determination on Issue No. 1, because the Arbitrator made an error of law by incorrectly holding that the Plan could not assess partial withdrawal liability pursuant to 29 U.S.C. § 1385(a)(1) when the three-year partial withdrawal test period ends in the plan year of a complete withdrawal or the plan year following the complete withdrawal. The Arbitrator also made an error of law by excluding the report of Rex Barker, which was relevant evidence as the Plan's actuarial assumptions and methods. Accordingly, the Plan properly assessed MeadWestvaco with 2014 and 2015 partial withdrawal liability pursuant to 29 U.S.C. §1385(a)(1).

(b) The Final Award should be affirmed and enforced against Defendants as to the Arbitrator's determination on Issue No. 2 that the interest rate

used by the Plan's actuary to calculate MeadWestvaco's withdrawal liability did not violate 29 U.S.C. § 1393.

(c) The Final Award should be affirmed and enforced against Defendants as to the Arbitrator's determination on Issue No. 3 that 26 CFR §4219.31(d) does not require the Plan to refund with interest MeadWestvaco's overpayment of withdrawal liability for the 2011 assessment when it re-calculated that liability because of the assessment of a 2012 Partial Withdrawal pursuant to 29 U.S.C. §1385(a)(1);

(d) An award of the Plan's attorneys' fees and costs pursuant to 29 U.S.C. §1451; and

(e) Such other and further relief as the Court finds just and proper.

Dated: <u>October 11, 2021</u>                   KRAW LAW GROUP, APC


                                          By: <u>/s/ Katherine McDonough</u>
                                          Katherine McDonough
                                          *Counsel for the Plaintiffs*

# ATTACHMENT
## (Final Award)

AMERICAN ARBITRATION ASSOCIATION
MULTIEMPLOYER PENSION PLAN ARBITRATION RULES FOR
WITHDRAWAL LIABILITY DISPUTES

| In the Matter of an Arbitration Between | |
|---|---|
| **MEADWESTVACO CORPORATION**<br>Claimant<br><br>- and - <br><br>**GCIU-EMPLOYER RETIREMENT FUND**<br>Respondent | **AWARD & OPINION**<br><br><br>NB 3947<br>AAA 01-19-0000-6697 |

**Arbitrator:**        **Norman Brand, Esq.**

**Appearances:**

**For** MEADWESTVACO Corporation
Morgan, Lewis & Bockius LLP
**By Daniel R. Salemi, Esq.**
   **Deborah S. Davidson, Esq.**
   **Benjamin T. Kelly**

**For** GCIU-Employer Retirement Fund
Kraw Law Group APC
**By Michael Korda, Esq.**
   **Valentina Mindirgasova, Esq.**

**Date:  September 26, 2021**

1

**Background**

In 2011, as a result of selling its U.S. Envelopes Division, MeadWestvaco

("MWV") had a partial withdrawal from the GCIU-Employer Retirement Fund ("Fund").

(JF 3)[1] On November 1, 2013, the Fund issued a notice and demand for partial

withdrawal liability (the 2011 Assessment). (JF 3) MWV paid its arrears on December

19, 2013 (JF 5) and continued making monthly payments on the 2011 Assessment

through June 2014, when the parties agreed to suspend payments while negotiating a

transfer of MWV's assets and liabilities to another fund. (JF 10,11,12) The transfer did

not occur. (JF13) In July 2015 MWV sent the Fund a check for the suspended

payments, resumed making monthly payments, and continued them through March

2018. (JF14,15,16)

In January 2014, MWV completely withdrew from the Fund. (JF 7) On January

21, 2015, for settlement purposes, the Fund prepared an estimate showing MWV's

liability for 70% partial withdrawals in 2012, 2013, a complete withdrawal in the 2013

plan year, and a partial withdrawal in 2014. (JF 8) On March 12, 2018, the Fund issued

notices and demands for 70% partial withdrawals (ERISA §4205(a)(1)) in 2012, and

2013, a complete withdrawal in 2014 (ERISA §4203(a)), 70% partial withdrawals

(ERISA §4205(a)(1) in 2014 and 2015. The notice included a recalculation of the 2011

Assessment, as required by the assessment for a 2012 partial withdrawal. (JX 7)[2] MWV

initiated arbitration on February 28, 2019 and the Fund responded on March 25, 2019.

---

[1] The parties provided a Joint Submission of Undisputed Facts containing 24 facts accompanied by 22 Joint Exhibits. The facts are referred to as "JF (number)." The accompanying exhibits are referred to as "JX (number)."

[2] The recalculation shows a credit for the 2012 partial withdrawal (deemed to have occurred in 2010) against the 2011 Assessment, reducing it to $850,765. (JF 19)

2

The parties did not agree on the need for an evidentiary hearing. MWV asked the Arbitrator for leave to file a partial summary judgement motion, which the Fund opposed, insisting a hearing was necessary. On July 20, 2020, the Arbitrator ruled against the motion. The parties then engaged in discovery. In a conference call on February 22, 2021, MWV asked to make a Motion in Limine to exclude the expert report and testimony of Mr. Barker (the Fund actuary) on whether there can be a partial withdrawal after a complete withdrawal. It did not oppose a hearing for Mr. Barker to testify about his choice of discount rate for calculating MWV's withdrawal liability. In the absence of testimony, MWV asserted it would use Mr. Barker's deposition and the Fund could put on a rebuttal. On March 29, 2021, the Arbitrator granted the Motion in Limine, excluding Mr. Barker's report and ruling he could not testify about the statutory propriety of assessing partial withdrawal for the year of MWV's complete withdrawal or the following year. The Arbitrator also ruled:

> Barker can testify on any aspect of the actuarial assumptions and methods he used to determine the discount rate he used in calculating Claimant's withdrawal liability.

On May 6, 2021, the parties informed the Arbitrator they had agreed to forego a hearing and submit the case on joint facts, joint exhibits, and briefs.

## Issues

The parties argued three issues:

1. Can the Fund assess 70% partial withdrawal liability when the three-year partial withdrawal test period ends in the plan year of a complete withdrawal or the plan year following the complete withdrawal?

2. Did the interest rate used by the Fund's actuary to calculate MWV's withdrawal liability violate ERISA §4213?

3. Did PBGC regulations at 29 CFR §4219.31(d) require the Fund to refund MWV's overpayment of withdrawal liability, with interest, when it assessed liability for the 2012 partial withdrawal and consequently recalculated the 2011 Assessment?

## Burden of Proof

… any determination made by a plan sponsor under sections 4201 through 4219 and section 4225 is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

(B) In the case of the determination of a plan's unfunded vested benefits for a plan year, the determination is presumed correct unless a party contesting the determination shows by a preponderance of evidence that –

(i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations …ERISA §4221(3)(A)

## Issue 1: Can the Fund assess 70% partial withdrawal liability when the three-year partial withdrawal test period ends in the plan year of a complete withdrawal or the plan year following the complete withdrawal?

MWV makes five arguments to demonstrate that assessing partial withdrawal liability for 2014 and 2015 was unreasonable or clearly erroneous. First, it cites an accepted definition of "employer":

… [in the] MPPAA context, four circuits have held that the term "employer," for purposes of the Act, means "a person who is *obligated to contribute* to a plan either as a direct employer or in the interest of an

4

employer of the plan's participants. *Cent. States, Se. & Sw. Areas Pension Fund v. Int'l Comfort Prods., LLC*, 585 F.3d 281, 284 (6th Cir. 2009)

It then looks to the language of ERISA §4205 (a) which provides:

> … there is a partial withdrawal by an employer from a plan … if there is a 70 percent -contribution decline …

MWV asserts that a complete withdrawal occurs under ERISA §4203(a)(1) "when an employer -- permanently ceases to have an obligation to contribute under the plan." When that occurs, MWV says, "the employer is no longer an "employer" for purposes of Title IV of ERISA." (Brief, at 8) An employer cannot have a partial withdrawal after it ceases to be an "employer." This is true for both 2014 and 2015.

Second, MWV argues by analogy to the abatement rules found at 29 C.F.R. §4207.1 et seq. Under those rules an employer who withdraws and subsequently resumes covered operations under a plan has its withdrawal liability abated. A plan assessing partial withdrawal liability against an employer who has had its withdrawal liability abated, may not include any "plan year during the period of withdrawal" in the three year testing period. This shows that a plan can only treat a withdrawn employer as an "employer" if it has resumed covered operations. An employer who does not resume covered operations cannot be treated as an "employer" in the year of its withdrawal or any subsequent year.

Third, ERISA §4206(b)(1) provides credit for earlier partial withdrawals when there is a partial or complete withdrawal in a subsequent year.

> The purpose of the credit is to protect a withdrawing employer from being charged twice for the same unfunded vested benefits of the plan. 29 C.F.R. § 4206.1(a)

There is no analogous credit to reduce a complete withdrawal followed by a subsequent partial withdrawal. The absence of such a provision indicates Congress did not intend the contribution history used for a complete withdrawal to be used coincident with or subsequent to the complete withdrawal.

Fourth, the legislative history of MPPAA shows that a partial withdrawal was intended to be an alternative to a complete withdrawal, not an addition to it. The legislative history provides:

> An employer becomes subject to withdrawal liability in some cases in the event of a partial withdrawal, that is, where the employer neither completely ceases to have an obligation to contributed under the plan nor permanently ceases all covered operations under the plan. Cong. Rec. S.10227, 96th Cong. (2d Sess.) (Daily Ed., July 29, 1980)

It is inconsistent with Congressional intent to allow the Fund to determine MWV both completely and partially withdrew, thereby assessing both partial and complete withdrawals for the same contribution decline.

Finally, MWV cites a recent District Court decision that upholds an arbitration award finding it was impermissible for the Fund to assess 70% contribution decline partial withdrawal liability for 2014 and 2015 after the employer completely withdrew in 2014. The court wrote: "No partial withdrawal can be imposed after a complete withdrawal. See Central States, Southeast and Southwest Areas Pension Fund v. Robinson Cartage Co., 55 F.3d 1318, 1321 n. 1 (7th Cir. 1995) (emphasis added) ("Partial withdrawal occurs when a contributing employer has not completely withdrawn from the Fund."); General Electric Company v. BoilerMaker-Blacksmith National Pension Trust, (citation omitted)" *Gciu-Employer Ret. Fund v. Mng Enters.*, 2021 U.S. Dist. LEXIS 145112 (C.D. Cal. July 8, 2021) at *9

The Fund asserts MWV failed to show the 2014 and 2015 assessments for partial withdrawal liability were unreasonable or clearly erroneous. It makes five arguments. First, MWV did not cease to be an "employer" when it completely withdrew. The statute uses the term "employer" for an employer who has completely withdrawn: when describing the Fund's obligation to notify the employer of the assessment; in describing the withdrawn employer's rights to contest the assessment; in describing the calculation of the obligation using an amortization period; and, in describing the consequences of a default.[3] These examples show that post-withdrawal the statute still describes the withdrawn employer as an employer. Consequently, it can be assessed 70% contribution decline partial withdrawal liability regardless of whether the last year of the 3 year test period occurs in the year of complete withdrawal, or the following year.

Second, the Abatement Rules have nothing to do with this case. MWV has not re-entered the Fund. Consequently, it is illogical to use the "principles of the Abatement Rules" to determine the propriety of assessing partial withdrawal liability for 2014 and 2015.

Third, in calculating 70% contribution decline partial withdrawal liability, the actuary is required to determine UVBs "as if the employer had withdrawn from the plan in a complete withdrawal … on the last day of the first plan year in the 3-year testing period." ERISA §4206(a)(1),(1)(B) Each of the partial withdrawal calculations was based on contributions during the time MWV was an "employer" because it was obligated to

---

[3] ERISA §4219(b)(1) "after an employer's complete or partial withdrawal, the plan sponsor shall … notify the employer of …"
ERISA §4219(b)(2)(A) "No later than 90 days after the employer receives the notice …"
ERISA §4219(c)(1)(a)(i) …an employer shall pay the amount determined under Section 4211…"
ERISA §4219(c)(5) …default, a plan sponsor may require immediate payment … of an employer's withdrawal liability…"

7

contribute to the Fund. For the 2014 plan year partial withdrawal, MWV was an "employer" during the 2012 and 2013 plan years. For the 2015 plan year partial withdrawal, MWV was an "employer" during the 2013 plan year. Thus, it was proper to calculate partial withdrawal liability both in the year of the complete withdrawal and the following year.

Fourth, both the calculation of 70% contribution decline partial withdrawal liability and its crediting are backward looking. Not only does the statute require using the first year of the three year period for calculating UVBs, the rules for crediting 70% contribution decline partial withdrawal liability provide that "the first year of the 3-year testing period shall be deemed to be the plan year in which the partial withdrawal occurred." Thus, the proper year for determining the propriety of a 70% contribution decline partial withdrawal liability is the first year of the 3 year test period, in this case 2012 and 2013, when MWV was clearly an "employer."[4]

Fifth, the district court decision cited by MWV should not be relied on because it "incorrectly applied and analyzed" ERISA §4205(a)(2) although there was no allegation by the Fund of a partial withdrawal due to a partial cessation of the Employer's obligation to contribute. The Fund intends to file an appeal and it is likely the opinion will be reversed and possibly remanded to consider the correct statutory section. Given the district court's misunderstanding, the Arbitrator should not apply its holding to MWV's 2014 and 2015  70% contribution decline partial withdrawal liability.

---

[4] The PBGC regulation defines its scope: This part applies to multiemployer plans covered under Title IV of ERISA, and to employers that have partially withdrawn from such plans after September 25, 1980 and subsequently completely or partially withdraw from the same plan. 29 C.F.R. § 4206.1

The Arbitrator finds MWV showed, by a preponderance of the evidence, that the Fund's determination to assess MWV partial withdrawal liability for 2014 and 2015, after its complete withdrawal in 2014, was unreasonable or clearly erroneous.[5] This finding is based on the language of the statute, buttressed by the common understanding of ordinary words, and assisted by an analogy.

First, as *International Comfort Products* asserts, it is well accepted that an "employer" is "a person who is *obligated to contribute* to a plan...." But not every use of the term "employer" in sections 4201-4219 signifies a "person who is obligated to contribute to a plan." The Fund notes that if an "employer" defaults on its payment obligation ERISA §4219(c)(5) permits the plan sponsor to require immediate payment of "an employer's withdrawal liability." The Fund cites this as an example of how the statute continues to regard a withdrawn employer as an "employer." Although MWV completely withdrew from the plan in 2014, the Fund concluded it was still an "employer" for purposes of ERISA §4205/6 in 2014 and 2015.This reasoning, however, ignores ERISA §4203(a), which defines a complete withdrawal as occurring when an employer "permanently ceases to have an obligation to contribute ....," and ERISA §4212(a)(2), which limits the meaning of the "obligation to contribute" by providing that "it does not include an obligation to pay withdrawal liability ...."[6] Thus, as an entity that permanently ceased to have an obligation to contribute, and whose sole obligation to the plan is to pay withdrawal liability, is not an "employer" as the term is used in ERISA §4205(a). Consequently, it was unreasonable or clearly erroneous for the Fund to

---

[5] The Arbitrator has not relied on the recent district court case cited by MWV.
[6] The Fund's other examples, all of which are from ERISA §4219(b) and (c) use the term "employer both for an entity that has had a partial withdrawal and one that has had a complete withdrawal.

9

assess 70% contribution decline partial withdrawal liability for the year of MWV's total

withdrawal and the following year.

The common understanding of the words "complete" and "partial" buttress this

finding. When interpreting  a statute, words are to be understood in their ordinary,

everyday meanings—unless the context indicates that they bear a technical sense.

"Complete" (adjective) means:

> Having all necessary or normal parts, components, or steps; entire. *The*
> *American Heritage® Dictionary of the English Language*, 5th Edition.
> https://duckduckgo.com/?q=%22complete%22+DEFINITION&ia=definition
> accessed 09/21/2021.

"Partial" (adjective) means:

> Of, relating to, being, or affecting only a part; not total; incomplete.
> *The American Heritage® Dictionary of the English Language*, 5th Edition.
> https://duckduckgo.com/?q=partial+definition&ia=definition accessed
> 09/21/2021.

A complete withdrawal is a cessation of the entire "obligation to contribute." A partial

withdrawal is a cessation "affecting only a part" of the "obligation to contribute." Once

the entire obligation to contribute has ended, no "part" of the "obligation to contribute"

remains. Given the ordinary meanings of "complete" and "partial," it is not possible for a

partial withdrawal to occur after a complete withdrawal. Thus, it was unreasonable or

clearly erroneous for the Fund to assess partial withdrawal liability against MWV for

2014 and 2015, after MWV had completely withdrawn in 2014.

Finally, the treatment of a withdrawn employer who subsequently returns to the

plan and has its withdrawal liability abated under the abatement rules (29 C.F.R.

§4207.1 et seq.) is consonant with this interpretation. That is, after a complete

withdrawal an employer is not an "employer" liable for a subsequent partial withdrawal

10

under ERISA §4205(b)(1). The period during which the returned employer  was not obligated to contribute to the plan is called the "period of withdrawal":

> *Period of withdrawal* means the plan year in which the employer completely withdrew from the plan, the plan year in which the employer reentered the plan and all intervening plan years. 29 C.F.R. §4207.2

The returned employer may subsequently be liable for 70% contribution decline partial withdrawal liability under ERISA §4205(b)(1). If so, the 3 year testing period is defined as:

> (1) *Definition of "3-year testing period.*" For purposes of section 4205(b)(1) of ERISA, the term "3-year testing period" means the period consisting of the plan year for which the determination is made and the two immediately preceding plan years, excluding any plan year during the period of withdrawal. 29 C.F.R. §4207.6(b)

In calculating the returned employer's partial withdrawal liability, the plan may not consider the years during which it did not have an obligation to contribute. The logic of this portion of the abatement rules is that during the time the returned employer did not have an obligation to contribute, it was not an "employer" for purposes of ERISA §4205(b)(1). It became an "employer" again by rejoining the plan and resuming an obligation to contribute. Nevertheless, the period during which it was not an "employer" cannot be used to determine subsequent partial withdrawal liability under ERISA §4205(b)(1). *A fortiori*, a withdrawn employer that does not rejoin the plan, and does not resume having an obligation to contribute, is not an "employer" for purposes of ERISA §4205(b)(1).

11

**Issue 2: Did the interest rate used by the Fund's actuary to calculate MWV's withdrawal liability violate ERISA §4213?**

MWV makes three arguments to support its assertion that using the PBGC rate[7] to calculate its withdrawal liability violated ERISA §4213. First, it asserts the statute, as interpreted by the courts, requires using the funding rate (8%) to calculate withdrawal liability. It cites the Supreme Court for the proposition:

> The statutory requirement (of "actuarial assumptions and methods -- which, in the aggregate, are reasonable . . .") is not unique to the withdrawal liability context, for the statute employs identical language… to describe the actuarial assumptions and methods to be used in determining whether a plan has satisfied the minimum funding requirements contained in the statute. *The use of the same language to describe the actuarial assumptions and methods* to be used in these different contexts tends to check the actuary's discretion in each of them. (emphasis added) *Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 632-33 (1993)

The identical language of the funding and withdrawal liability sections, which the Court deems a "check" on actuarial discretion, is no longer identical. ERISA §304(c)(3)(A) now reads: "actuarial assumptions and methods – each of which is reasonable." If reliance on the Court's language to prove the actuary must use the same interest rate for both calculations were ever justified, it no longer is.

MWV cites three other cases for the proposition:

> …the Fund actuary's use of different assumptions [for funding and withdrawal liability] is contrary to the plain language of ERISA, contrary to the prescribed method for the calculation of withdrawal liability, and inconsistent with the purpose of withdrawal liability and how it is to calculated. (Brief at 17)

---

[7] The PBGC rate is an interest assumption that must be used to "value benefits and certain assets … following mass withdrawals." (JX-10.3) It represents "an annuity purchase or settlement …." (JX-10; 29:11-12)

One of the cases correctly summarizes the law and directly contradicts MWV's

assertion the actuary must use the same interest rate for both calculations:

> Like the court in *New York Times*, the Court finds that to the extent Sofco argues that "the use of different interest rates in different contexts is always impermissible as a matter of law, that argument fails." *New York Times*, 303 F. Supp. 3d at 254-55 (referring to *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993)); *see also Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 354-55 (7th Cir. 2012) ("Language in the Supreme Court's decision in *Concrete Pipe* . . . could be read to suggest that having two different interest-rate assumptions—one for withdrawal [*28] liability and one for avoiding the tax penalty—might make a plan vulnerable to claims that either or both were 'unreasonable' within the meaning of 29 U.S.C. § 1393(a)(1). The danger was remote; the Court had indicated that 'supplemental' assumptions that might cause the rates to diverge were permissible."); *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F. Supp. 3d 365, 389-92 (D.N.J. 2018) (affirming arbitration award upholding a fund's use of the Segal Blend rate to calculate withdrawal liability where the fund used different rates in other contexts); PBGC Op. Ltr. 86-24 (Oct. 31, 1986) ("There is no requirement that the actuarial assumptions used to determine withdrawal liability be the same as those used for [minimum funding] purposes."). *Sofco Erectors, Inc. v. Trs. of the Ohio Operating Eng'rs Pension Fund*, No. 2:19-cv-2238, 2020 U.S. Dist. LEXIS 87774, at *27-28 (S.D. Ohio May 19, 2020)

There is no statutory requirement to use the same interest assumption for calculating

minimum funding and withdrawal liability.

Second, even if the Fund were not required to use the funding rate to calculate

withdrawal liability, MWV argues, the PBGC rate was not the actuary's best estimate of

anticipated experience under the plan. The actuary testified that the PBGC rate

represented "the theoretical concept that an employer is being done with the plan,

they're settling the obligations, so we should use the settlement measure of liabilities

...." (JX-10; 33:1-5)  He conceded, however, that the Fund did not use MWV's

withdrawal liability payments to buy annuities.  The Fund actuary's best estimate of how

13

its investment portfolio would perform was 8%. Since the Fund did not invest MWV's withdrawal liability payments in annuities, the annuity rate could not represent the actuary's best estimate of anticipated experience under the plan. The actuary's best estimate of the Fund's anticipated experience was 8%, not the PBGC rate. Thus, the actuary's testimony overcomes the presumption he correctly calculated MWV's UVBs using the PBGC rate.

The Fund makes three arguments to demonstrate that MWV failed to meet its burden of showing, by a preponderance of the evidence, that the "actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations…"

First, it argues that the Supreme Court defined MWV's burden:

> The employer merely has a burden to show that an apparently unbiased professional, whose obligations tend to moderate any claimed inclination to come down hard on withdrawing employers, has based a calculation on a combination of methods and assumptions that falls outside the range of reasonable actuarial practice. To be sure, the burden may not be so "mere" when one considers that actuarial practice has been described as more in the nature of an "actuarial art" than a science, (citation omitted), and that the employer's burden covers "technical actuarial matters with respect to which there are often several equally 'correct' approaches," Committee Print 20-21. But since imprecision inheres in the choice of actuarial methods and assumptions, the resulting difficulty is simply in the nature of the beast.
> *Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 635-36 (1993)

MWV, the Fund argues, "has not presented a scintilla of evidence on the question of whether Mr. Barker's actuarial interest rate assumption used to calculate its UVBs would not have been acceptable to a reasonable actuary." (Brief at 13)

Second, neither the statute, nor *Concrete Pipe*, nor case law mandates using a single interest rate to calculate withdrawal liability. Finally, once the actuary chose a

14

discount rate for calculating MWV's complete withdrawal liability it is presumed correct. MWV must show by a preponderance of the evidence the actuarial methods and assumptions used in determining its withdrawal liability were, in the aggregate, unreasonable. It failed to do so.

The Arbitrator finds MWV failed to show "by a preponderance of evidence that the actuarial assumptions and methods used in the determination [of its withdrawal liability] were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations..." There are two reasons for this finding.

First, MWV failed to show the statute, or case law interpreting it, mandates the actuary use the same discount rate when calculating minimum funding under ERISA §304 and withdrawal liability under ERISA §4213. *Sofco* and the cases it cites make it clear that there is no statutory prohibition on using two different interest rates to calculate minimum funding and withdrawal liability. (Accord, *UMW 1974Pension Plan v. Energy West Mining Co. 464 F. Supp. 3d 104)*[8]

Second, MWV failed to show the Fund actuary "based a calculation on a combination of methods and assumptions that falls outside the range of reasonable actuarial practice." MWV relies on ordinary meanings for "plan experience," "reasonable expectations," and "anticipated experience" to argue the Fund actuary's methods and assumptions were, in the aggregate, unreasonable. As the Court made clear in *Concrete Pipe*, however, those ordinary words have a technical meaning in ERISA §4213. They are used in relation to an actuarial calculation that is guided by actuarial

---

[8] There, as here, the fund actuary used the PBGC rate to calculate UVBs, not the funding rate.

standards of practice. The employer's burden covers "technical actuarial matters with respect to which there are often several equally 'correct' approaches," and the latitude encompassed by these actuarial practice. As the Fund noted, MWV made no showing whatsoever that the actuary's use of "the theoretical concept … [MWV was] … settling the obligations …" it had to the plan, when he calculated MWV's withdrawal liability, was "outside the range of reasonable actuarial practice." It chose not to question him about how the concept of settling obligations affected his expectations or best estimate of anticipated experience of the plan. Nor did it provide any expert testimony that choosing a "settlement rate" to calculate withdrawal liability, or using the PBGC rate as the "settlement rate," is "outside the range of reasonable actuarial practice." Despite the Court's admonition about its burden in *Concrete Pipe*, MWV provided neither expert actuarial testimony, nor a detailed examination of the Fund's actuary about his actuarial methods and assumptions. It failed to overcome, by a preponderance of the evidence, the statutory presumption the Fund actuary used actuarial methods and assumptions that were in the aggregate reasonable.

**Issue 3: Did PBGC regulations at 29 CFR §4219.31(d) require the Fund to refund MWV's overpayment of withdrawal liability, with interest, when it assessed liability for the 2012 partial withdrawal and consequently recalculated the 2011 Assessment?**

The stipulated facts show that after MWV completely withdrew in 2014 the Fund "prepared an estimated assessment … for settlement negotiation purposes…" in January 2015. The estimate included a recalculation of the 2011 Assessment to apply credit for the 2012 partial withdrawal. (JF-8; JX-5) The parties agreed to a cessation of

16

MWV's monthly payments on the 2011 Assessment from June 2014 to July 2015, when

the forborne payments were made and monthly payments resumed. (JF-11,14, 15)[9] The

Fund sent its notice and demand for the withdrawal liability at issue in this arbitration on

March 12, 2018. (JF-18) In the demand the Fund wrote:

> As a result of the recalculation of the  2011 partial withdrawal,
> MeadWestvaco Corp. has now paid this assessment in full, and has
> overpaid it by $6,271,841.74. This overpayment is discussed in more
> detail below. (JX-7, p. 2)

The Fund gave MWV two options for crediting the overpayment. The first was to apply

the overpayment "evenly towards the monthly installments for each of the assessments

addressed in this letter; or" :

> The overpayment can be applied to pay off the 2013 partial withdrawal
> due to 70% decline assessment, the 2015 partial withdrawal due to 70%
> decline assessment, and the complete withdrawal assessment. The
> remaining amount would be applied evenly to the monthly installments for
> the 2012 and 2014 partial withdrawal due to 70% decline assessments.
> (JX-7)

On June 8, 2018, in its request for review, MWV asserted:

> The Fund improperly allocated the Company's credit for its prior
> overpayment of withdrawal liability and failed to credit interest to the
> Company with respect to this amount in accordance with 29 C.F.R.
> §§4219.31(d) (JX-11, 04404)

On October 5, 2018, the Fund responded to the request for review, explaining that the

"overpayment" for the 2011 Assessment was a result of the subsequent 2012 partial

withdrawal under ERISA §4205(a)(1). As prescribed by ERISA §4206(b), the Fund

reduced the 2011 Assessment to reflect the prior year partial withdrawal. The Fund

noted in its response to the request for review that it had:

---

[9] The lump sum payment of the suspended monthly payments did not include any interest. (JF-15)

> …specifically asked the Company to tell the Fund how the amount should be applied. Moreover, the Company informed the Fund that the "overpayment" is to be credited against any withdrawal liability installments that may come due until the issue of the interest on the overpayment is resolved. (JX-12)

MWV does not contradict the Fund's assertion it requested the overpayment be credited against withdrawal liability installments as they came due.[10] Having agreed to use the credit from re-calculating the 2011 Assessment against future withdrawal liability installments, MWV is estopped from arguing the Fund should return the money. The only question is whether the Fund must pay MWV interest on the difference between what MWV paid toward the original 2011 Assessment and what it owed for that partial withdrawal when the Fund re-calculated it on March 12, 2018.

MWV makes three arguments to support the claim it is owed interest. First, it asserts that "when a plan improperly calculates an assessment, the PBGC regulation requires that the plan repay the overpayment with interest." (Initial Brief, at 24) MWV asserts the Fund is required to pay interest on its overpayment of withdrawal liability on the original 2011 Assessment because it re-calculated the 2011 Assessment. It cites 29 C.F.R. § 4219.31:

> **(d)** Overpayments. If the plan sponsor or an arbitrator determines that payments made in accordance with the schedule of payments established by the plan sponsor have resulted in an overpayment of withdrawal liability, the plan sponsor shall refund the overpayment, with interest, in a lump sum. The plan sponsor shall credit interest on the overpayment from the date of the overpayment to the date on which the overpayment is refunded to the employer at the same rate as the rate for overdue withdrawal liability payments, as established under § 4219.32 or by the plan pursuant to § 4219.33.

---

[10] The Fund asserts the credit was used in lieu of interim payments until March 2020, when it was exhausted.

The Fund has adopted the following provision in accordance with 29 C.F.R. 4219.33:

> Interest on overdue and defaulted amounts will be assessed by the Administrative Office for each calendar quarter at an annual rate equal to the average quoted prime rate on short-term commercial loans for the fifteenth day of the month preceding the beginning of each calendar quarter as reported by the Board of Governors of the Federal Reserve System in Statistical Release H.15. Interest shall be calculated by multiplying the defaulted or overdue amount by
>
> (a)   for each full calendar quarter in the period from the due date to the date paid, one-fourth of the annual rate in effect for that quarter;
>
> (b)   for each full calendar month in a partial quarter in that period, one-twelfth of the annual rate in effect for that quarter; and
>
> (c)   for each day in a partial month in that period, one-three-hundred-sixtieth of the annual rate in effect for that month.

Under these provision, MWV argues, it is entitled to interest on the difference between the amount it paid on the original 2011 Assessment and the amount it owes for its 2011 partial withdrawal after the 2018 recalculation.

Second, the regulation's requirement to pay interest is especially important in this case  because the Fund knew MWV had overpaid the 2011 Assessment by January 21, 2015. At that time MWV had paid almost four times what it would owe on the re-calculated 2011 Assessment. When a re-assessment results in a larger amount of withdrawal liability, the Fund cannot charge any interest because nothing is owed or overdue until the demand is made. However, "when a plan improperly calculates an assessment, the PBGC regulation requires that the plan repay the overpayment, with interest."(Initial Brief, at 24)

Third, it is irrelevant that MWV continued to owe withdrawal liability despite the recalculation leading to the overpayment. The regulation requires each assessment to be considered separately. It refers to "the schedule of payments established by the plan sponsor," as the source for determining whether there is an overpayment. There were

six assessments and schedules of payments in the 2018 notice and demand. The overpayment occurred only because of the recalculation of the 2011 Assessment schedule. Consequently, the payments made in accordance with that schedule constituted overpayments and the regulation requires the Fund to pay interest on those overpayments.

The Fund makes three arguments to support its position that no interest is owed. First, it asserts there was no overpayment. After crediting MWV for the 2012 partial withdrawal, MWV still owed withdrawal liability for the four partial withdrawals and the complete withdrawal. Returning the credit to MWV, while it still owed more than that amount in withdrawal liability, would violate the anti-inurement rule.

Second, MWV agreed to apply the credit from the recalculation of the 2011 Assessment to future withdrawal liability payments it still owed the Fund. It did not demand the Fund pay that amount as a lump sum with interest as it now alleges it is entitled to do under §4219.31. By failing to preserve its demand for the lump sum the regulation requires, MWV waived its argument that an overpayment existed.

Third, if there were an overpayment, MWV would not be entitled to any interest. §4219.31 requires the Fund to calculate interest for overpayments "at the same rate as the rate for overdue withdrawal liability payments." The Fund does not pay interest when a reassessment results in a credit that would be wiped out by higher withdrawal liability.[11] Thus, the rate to be applied to this overage resulting from a reassessment is 0%.

---

[11] Exhibit JX-22 contains the two cases in which the Fund re-calculated withdrawal liability and, as here, did not pay interest.

The Arbitrator finds MWV is not entitled to interest on the difference between what it paid on the 2011 Assessment and what it owed for its 2011 partial withdrawal after the Fund re-calculated its withdrawal liability based on subsequent partial withdrawals and the 2014 complete withdrawal. There are two reasons for this finding. '

First, the regulation exists within a statutory framework that requires an employer to begin making withdrawal liability payments "no later than 60 days after the date of the demand notwithstanding any request for review or appeal…" ERISA §4219(c)(2). The statute provides for both a request for review and an appeal to arbitration. ERISA §4219(b); 4221  It is impossible for an employer to challenge an assessment of withdrawal liability without having to make scheduled withdrawal liability payments. The statute recognizes this by providing for adjustments after arbitration. ERISA § 4221(d). The regulation implements these adjustments, recognizing that a change can be made both through the request for review and arbitration. Consequently, it begins:" "If the plan sponsor or an arbitrator determines…" This pairing of "plan sponsor" and "arbitrator" indicates the regulation applies to those situations in which an employer contests the propriety of the Fund's withdrawal liability determination, since an arbitrator would not otherwise be involved. The regulation extends to the situation in which, after a request for review and further analysis by the plan sponsor, the plan sponsor recognizes that it made an error and corrects it. When that occurs, the plan sponsor will have determined there was an overpayment and is required to refund it with interest.

MWV does not contest the Fund's re-determination of its 2011 Assessment; it agrees with it. Nevertheless, it asserts: "when a plan improperly calculates an assessment, the PBGC regulation requires that the plan repay the overpayment, with

interest."(Initial Brief, at 24) But that is not the case here. The Fund has not improperly calculated the assessment. Quite the opposite. It has properly re-calculated the 2011 Assessment to account for the 2012 partial withdrawal. Because the Fund did not incorrectly calculate MWV's assessment, and because MWV continues to owe withdrawal liability in accordance with the 2018 assessment, the Fund does not owe MWV any interest.[12]

Second, an interpretation of the regulation that conflicts with a statutory obligation is unlikely to be correct. The Fund correctly calculated the 2011 Assessment both before and after it assessed MWV's 2012 partial withdrawal liability. The Fund re-calculated the 2011 Assessment to avoid charging MWV twice for the same UVBs, as required by ERISA § 4206(b). Neither the plan sponsor, nor the Arbitrator, has determined that MWV overpaid its withdrawal liability. Rather, the Arbitrator finds the Fund allowed MWV to choose how it would use its credit for payments on the original 2011 Assessment. It used them to continue paying its outstanding withdrawal liability.

MWV asserts that if a withdrawal liability calculation is redone because of a subsequent withdrawal – and that calculation results in a credit – the employer must be repaid a lump sum with interest, regardless of whether the employer still owes withdrawal liability. The assertion is not consonant with the statute for two reasons: a) it penalizes the Fund for following the requirement of ERISA §4206(b) to re-calculate a partial withdrawal to avoid charging an employer twice for the same UVBs; and, b) it incorrectly characterizes payments the Fund was entitled to collect when they were

---

[12] The Fund will be obliged to re-calculate MWV's withdrawal liability, based on the finding that it could not charge partial withdrawal liability for the years MWV was not an "employer". Whether that will require any repayment or interest is not known at this time.

paid, from a withdrawn employer that still owes withdrawal liability, as an "overpayment" to apply ERISA §4221(d) and 29 C.F.R. 4219.31(d). This characterization does turn a correct recalculation of an assessment into an "improperly calculated assessment. Consequently, the regulation does not apply. The Fund does not owe any interest to MWV.

**Award**

1. **The Fund cannot assess 70% partial withdrawal liability when the three-year partial withdrawal test period ends in the plan year of a complete withdrawal or the plan year following the complete withdrawal.**

2. **The interest rate used by the Fund's actuary to calculate MWV's withdrawal liability did not violate ERISA §4213.**

3. **PBGC regulation 29 CFR §4219.31(d) did not require the Fund to refund with interest MWV's overpayment of withdrawal liability for the 2011 Assessment when it re-calculated that liability because of the 2012 partial withdrawal**

**San Francisco, California**
**September 26, 2021**

*Norman Brand*
**Norman Brand**

23